PER CURIAM: *
On September 6, 2012, we entered an order granting Appellant Texas Secretary of State Hope Andrade’s[1] Emergency Motion to Stay the district court’s Order (as modified) granting in part a preliminary injunction against the enforcement of certain Texas statutes and stating that reasons would be assigned later. Those reasons follow.
I. Background of Election Code Chapter 13
Like other states, Texas has a system by which citizens desiring to vote in elections *892 must register with the state. See generally Tex. Eleo.Code § 11.001 et seq. “To encourage voter registration,” Texas has instituted a system whereby volunteers can be appointed as “volunteer deputy registrars” (VDRs) empowered to accept voters’ applications to be registered. Tex. Elec.Code § 13.031 et seq. (hereinafter the “VDR Law”). This basic structure has existed for over twenty years in Texas, with little incident and almost no reported cases. However, in 2011, the Texas legislature amended the VDR Law to add certain requirements, including training of VDRs. Tex. Elec.Code § 13.047.
Appellant Hope Andrade is the Texas Secretary of State; in that capacity, she is charged with administering Texas’s election laws.[2] Appellees Voting for America, Inc., Project Vote, Inc., Brad Richey, and Penelope McFadden (“Appellees”) state in their complaint that Richey and McFadden are individuals who have had difficulty both registering to vote in Texas and becoming VDRs; the two organizations have as their mission working to ensure that all eligible citizens register to vote. In response to the 2011 amendments of the Texas Election Code, Appellees contend that they made inquiries of Andrade regarding the meaning of certain provisions in the VDR Law. Unsatisfied with her response, they filed this lawsuit seeking a preliminary and permanent injunction against many of the provisions of the VDR Law, both old and new. After briefing and an oral hearing at which testimonial and other evidence was presented, the district court entered an Order Granting in Part and Denying in Part Plaintiffs’ Motion for a Preliminary Injunction. The court then modified this order twelve days later and denied Andrade’s motion for a stay pending appeal. See Voting for Am., Inc. v. Andrade, No. 3:12-CV-00044, Order Den. Mot. for Stay (SD.Tex. Aug. 14, 2012). Andrade appealed both orders to this court and, in the interim, sought a stay of the district court’s order which, in turn, enjoins enforcement of certain portions of the VDR Law. We examine the order as modified as one unitary document.
Pertinent to this appeal, the district court enjoined enforcement of the following portions of the VDR Law:[3]
(1) that portion of Texas Election Code § 13.038 that prohibits VDRs from photocopying or other duplicating of voter registration applications submitted to the VDR but not yet forwarded to the county registrar (so long as no information deemed confidential under § 13.004 is included)(the “Photocopying Provision”)[4];
*893 (2) that portion of Texas Election Code § 18.042 that prohibits VDRs from sending in applications by United States mail (the “Personal Delivery Provision”);
(3) that portion of Texas Election Code § 18.081(d)(8) to the extent it forbids non-Texas residents from serving as VDRs (the “Non-Resident Provision”);
(4) that portion of Texas Election Code § 13.038 that prohibits VDRs appointed in one county from serving in another county (the “County Provision”)[5]; and
(5) Texas Election Code § 13.008(a)(2) & (3) (the “Compensation Provision”).
The task before this court is only to decide the emergency motion to stay, which we decided on an abbreviated briefing schedule and within a limited time (although we did hear oral argument, conducted on shortened notice). The question we address, then, is whether, while the appeal is pending, Texas can enforce the entirety of the VDR Law or whether it is proscribed from enforcing the sections outlined in the district court’s injunction. We disclaim any intent to bind a subsequent merits panel.
It sometimes takes time to decide a question, but, meanwhile, time itself does not “stand still.” Nken v. Holder, 556 U.S. 418, 421, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). “A stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it.” Id. Before addressing the merits of the stay motion, we must first examine the applicable standards.
II. Standards For Granting a Stay
The standards for granting a stay pending appeal are well-established: “(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.” Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); see also Nken, 556 U.S. at 426, 129 S.Ct. 1749. Such a stay is a matter of judicial discretion, not a matter of right.[6] Nken, 556 U.S. at 433, 129 S.Ct. 1749. The factors to be considered in deciding whether to stay an order pending appeal are virtually the same as the factors used by a court in deciding whether to issue a preliminary injunction.[7] Thus, we *894 have here the somewhat circular situation of deciding whether there is irreparable harm to Andrade in part by analyzing the likelihood of success on the merits by Ap-pellees of showing irreparable harm to them.[8] This analysis plays out against a backdrop of impending November 6, 2012, elections for which the voter registration deadline in Texas is October 9, 2012.
In this case, both sides cloak themselves in the mantle of irreparable harm — An-drade, because all the ills that gave rise to the need for the VDR Law can occur in connection with voter registration for the upcoming election, while Appellees counter that they will be prevented from fully implementing their large-scale voter registration drive efforts in connection with the same election. In one corner, Appellees valiantly champion the need to both encourage and facilitate citizens in registering to vote, a noble tradition in our country. In the other corner, Andrade agrees with this need, but is concerned about protecting the integrity of the registration process from harms of fraud or error, and from people who might seek to disenfranchise those with whom they disagree. Both sides claim the public interest supports them and that their prospective harm is greater than the harm to the other. While this panel rules only on the immediate motion to stay the district court’s injunctive order pending appeal, the analysis under these circumstances centers on the likelihood of success on the merits. We turn to that question first.
III. Discussion
A. Standards Applicable to the Merits
The Supreme Court has expressly countenanced “substantial regulation of elections” to avoid “chaos,” even as it has protected important rights, such as petitioning the government. Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 186, 119 S.Ct. 686, 142 L.Ed.2d 599 (1999) (internal citation and quotation marks omitted). Thus, a state has a substantial interest in protecting the sanctity of the voting process through regulation, even as it provides for the basic constitutional protections afforded to the political process.
Appellees made two basic challenges to the various sections of the VDR Law: violations of the First Amendment of the United States Constitution and violations of the National Voter Registration Act (“NVRA”), 42 U.S.C. §§ 197Sgg et seq. Specifically, they contend that their right to engage in voter registration activities is “expressive” in nature, such that limitations upon it abridge Appellees’ First Amendment rights. Relevant to this motion to stay and the underlying appeal, the district court grounded its preliminary injunction against enforcement of the NonResident, County, and Compensation Provisions in First Amendment jurisprudence. It based the injunction against the Personal Delivery Provision and the Photocopying Provision upon the premise that they violate the NVRA. We examine each in turn.
Turning to the constitutional analysis, while not a model of clarity, it appears that *895 Appellees make a facial challenge to the particular provisions, a very high hurdle.[9] See, e.g., United States v. Robinson, 367 F.3d 278, 290 (5th Cir.2004) (“A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.”) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). They cite to no application or threatened enforcement of any provision relevant only to the Appellees, or causing substantial detriment particular to their specific interests.[10] Instead, they broadly challenge the relevant provisions as unconstitutional.
Our task as a federal court is, to the extent possible, to construe the provisions to avoid a constitutional conflict. See, e.g., Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990). A federal court should not lightly enjoin the enforcement of a state statute. Chisom v. Roemer, 853 F.2d 1186, 1189 (5th Cir.1988). The determination of whether a democratically enacted statute is constitutional on its face requires that “every reasonable construction must be resorted to [ ] in order to save a statute from unconstitutionality.” National Federation of Independent Business v. Sebeli-us, — U.S. -, 132 S.Ct. 2566, 2594, 183 L.Ed.2d 450 (2012). In this vein, An-drade’s interpretation must be accorded some meaningful weight, as she is the official charged with enforcing the statute. See Bellotti v. Baird, 428 U.S. 132, 143, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). We defer to her interpretation of how the law is to be enforced, so long as it does not conflict with the statutory text. See Hamer v. Musselwhite, 376 F.2d 479, 481 (5th Cir.1967) (deferring to the city’s interpretation of an ordinance because city officials are charged with enforcing the statute and are the ones who must apply it).
Most constitutional analyses of a statute begin -with an examination of the degree of scrutiny a statute will receive. Cf. District of Columbia v. Heller, 554 U.S. 570, 634, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (describing three “traditionally expressed levels” of scrutiny: “strict scrutiny, intermediate scrutiny, [and] rational basis”). Strict scrutiny, the most severe test, is applied to “core political speech,” described as “interactive communication concerning political change.” Meyer v. Grant, 486 U.S. 414, 422, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Importantly, simply labeling a challenge as one under constitutional guarantee such as free speech does not make strict scrutiny applicable. See, *896 e.g., United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir.2010) (“[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue.” (internal citations omitted)). The district court appeared to apply “intermediate scrutiny,”[11] reasoning that all aspects of the voter registration process are “expressive” in nature, thus implicating First Amendment rights and requiring (at least) intermediate scrutiny under Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). See Andrade, — F.Supp.2d at -, 2012 WL 3155566, at *19-23. Under this test, state election codes regulating voter registration may burden an individual’s right to vote and to political association, but only to the extent justified by the State’s legitimate goals. Anderson, 460 U.S. at 788, 103 S.Ct. 1564; see also R.A.V. v. St Paul, 505 U.S. 377, 429, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (“[T]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.”) (quoting Texas v. Johnson, 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). Alternatively, if the conduct is found to be non-expressive and therefore unprotected, the statute will be scrutinized for its “rational basis.” See Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783 (if the law does not implicate a specific constitutional rights, such as freedom of speech, then rational basis review applies).
In examining the claimed violations of the NVRA, we must analyze whether the challenged provisions of the VDR Law conflict with the federal statute such that the NVRA preempts the contrary state provision. Though states generally bear responsibility for the mechanics of congressional elections, Congress may act to preempt state legislative choices. See Foster v. Love, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997). Much like traditional Supremacy Clause preemption, conflicts with federal election regulations render state law inoperative. See Ex parte Siebold, 100 U.S. 371, 384, 25 L.Ed. 717 (1879). To this end, state laws cannot “directly conflict” with federal election laws on the subject. Voting Integrity Project, Inc. v. Bomer, 199 F.3d 773, 775 (5th Cir.2000). However, when confronted with two possible interpretations of state law, the court has “a duty to accept the reading that disfavors pre-emption.” Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).
B. Likelihood of Success on the Merits
1. County and Non-Resident Provisions
We conclude that Andrade has presented a strong likelihood of success on the merits in that the district court incorrectly applied these standards in the order it issued. We turn first to the County Provision and the Non-Resident Provision, both of which, as pertinent here, apply only to the question of who may be appointed as a VDR and empowered to physically receive a completed voter registration application from a potential voter and transmit it to the proper county official.
*897 The First Amendment protects political expression manifested through conduct, as well as speech. See Johnson, 491 U.S. at 406, 109 S.Ct. 2533 (holding that the burning of an American flag is conduct “sufficiently imbued with elements of communication to implicate the First Amendment” (internal citation and quotation marks omitted)). To determine whether particular conduct possesses sufficient “communicative elements” to fall under the First Amendment, courts look to whether there was “[a]n intent to convey a particularized message” and whether “the likelihood was great that the message would be understood by those who viewed it.” Id. at 404, 109 S.Ct. 2533 (internal citations omitted).
All parties agree that the primary act of simply encouraging citizens to vote constitutes core speech and would be protected under the First Amendment. State restrictions on this activity would be analyzed under the lens of strict scrutiny, under which the state would have to advance a compelling justification for its regulation. Concomitantly, we have recognized that states have a compelling interest in protecting citizen’s rights to vote. Schirmer v. Edwards, 2 F.3d 117, 121 (5th Cir.1993) (upholding limits on electioneering within a certain distance from a polling place). No one contends that Appellees have been prevented from actually speaking to anyone about voting; at best, they have made an argument that their “expressive conduct” is being restricted. Importantly here, Andrade has repeatedly asserted that she does not and will not seek to enforce the VDR Law to prevent any individual or organization from freely handing out voter registration applications and encouraging citizens to vote. The district court accepted these representations for purposes of its analysis, so we do as well. Thus, the focus of the VDR Law as enjoined by the district court is not on whether a party may encourage another to register to vote, but whether a private party can actually receive the prospective voter’s completed registration application and handle it in some way. In essence, they contend a First Amendment right not just to speak out or engage in “expressive conduct” but also to succeed in their ultimate goal regardless of any other considerations.[12]
*898 Appellees contend, and the district court accepted, that all aspects of a voter registration drive are “expressive conduct” protected by the First Amendment.[13] We perceive a significant distinction between voter registration activity that urges citizens to vote (constituting protected expressive conduct, allowed without regulation by the VDR Law as considered by the district court), and'the activity of collecting completed applications and submitting them to the government on behalf of voters (non-expressive conduct, permissibly regulated by the VDR provisions). Because different legal principles apply to these two discrete actions, it is important to assess regulations on each separately. See Planned Parenthood v. Suehs, 692 F.3d 343, 349-50 (5th Cir.2012) (reviewing a temporary injunction that impermissibly grouped state regulations on promotion of abortion with the right to affiliate with other pro-choice supporters).
We conclude there is nothing “inherently expressive” about receiving a person’s completed application and being charged with getting that application to the proper place.[14] See Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (“[W]e have extended First Amendment protection only to conduct that is inherently expressive.”). No circuit court has held that the actual receipt and delivery process is, itself, entitled to First Amendment protection.[15] District courts *899 that have held as the district court did here fail to apply the discerning regulation-by-regulation analysis we most recently employed in Suehs. See League of Women Voters v. Cobb, 447 F.Supp.2d 1314, 1322 (S.D.Fla.2006) (finding certain requirements imposed on third-parties who collect registration forms unconstitutional as “reducing the quantum of political speech”[16]); Project Vote v. Blackwell, 455 F.Supp.2d 694, 699 (N.D.Ohio 2006) (applying intermediate scrutiny to all aspects of third-party registration laws); see also American Association of People with Disabilities v. Herrera, 690 F.Supp.2d 1183, 1200 (D.N.M.2010) (finding that the plaintiffs generalized third party voter registration activity implicated expressive conduct because it was intended to “convey a message that voting is important”). The courts broadly considered voter registration activities as protected activity generally, instead of drawing distinctions between the type of conduct and type of regulation at issue. Thus, we find their analyses unpersuasive.
Because we conclude that the physical receipt and delivery of completed voter registration applications are not “expressive conduct” as separately analyzed and are not “part and parcel” of the expressive conduct, we employ rational basis scrutiny to the County and Non-Resident Provisions. With respect to the Non-Resident Provision and the County Provision, An-drade justifies these requirements on the theory that local control over people entrusted with these applications is an important and necessary safeguard in preventing fraud and improper handling of such applications. While we cast no aspersions on the parties before us, we recognize that without some regulation, out-of-state individuals could descend upon Texas before the voter registration deadline, engage in unlawful and fraudulent registration practices, and then leave the state before action could be taken against them. Importantly, Appellees’ own witness (Executive Director of Project Vote, Michael Slater) eschewed any desire to have the voter registration drives run entirely by those from out-of-state, dismissing the practice of “parachuting in” by out of state individuals.[17] He emphasized that registration drives are much more effective when conducted by locally-recruited personnel. Requiring that VDRs be residents of Texas enables law enforcement officials to more readily find and hold accountable those who engage in unlawful practices. *900 As such, Andrade has demonstrated a rational basis for these laws.
Appellees suggest (and the district court and dissenting opinion appear to accept) that these provisions will prevent non-resident volunteers from participating in voter registration drives. Nothing in the statute or record indicates that non-resident volunteers will be prohibited from participating in voter registration activities in a non-VDR capacity. Indeed, Andrade has made it clear that the act of passing out voter registration applications or otherwise encouraging voter participation may be performed by any individual. National “get out the vote” campaigns can still operate in Texas largely unchanged, provided there are properly appointed resident VDRs involved to facilitate any activities that only VDRs are empowered to do (namely the receipt and transmission of the completed application).[18] No evidence was presented that “get-out-the-vote” efforts actually have been unable to operate prior to or after the amendments to the VDR Law. Indeed, Appellees’ witness was unaware of the effects of the VDR Law on other groups’ voter registration efforts in Texas, only vaguely stating that they have not told him they are conducting drives. We conclude that Andrade has made a strong showing of the likelihood of succeeding on appeal in showing that the County and Non-Resident Provisions meet this threshold.
2. Compensation Provisions
With respect to the Compensation Provisions, we agree that these provisions encompass some expressive conduct rather than merely the receipt and delivery of completed voter registration applications. Cf. Meyer, 486 U.S. at 428, 108 S.Ct. 1886 (striking down a Colorado law prohibiting payment of petition circulators). Thus, we assume without deciding that intermediate scrutiny applies to the compensation provisions. Andrade explains that these provisions are designed to avoid placing paid “volunteers” in the position of having to meet particular number or quota requirements in their registration efforts. The incentives for fraud in a quota system are obvious, as Appellees implicitly concede, and Appellees do not even wish to pay their “volunteers” on a quota or numerical basis.[19] Instead, they speculate that they will be unable to hire and fire people who fail to perform properly because they may run afoul of the Compensation Provisions.[20] We conclude that rather than construing these provisions to find them constitutional, particularly important in a facial challenge case, the district court accepted Appellees’ proffer of speculative and imagined circumstances that might make the provisions unconstitutional as applied to a hypothetical situation. Project Vote v. Kelly, 805 F.Supp.2d 152 (W.D.Pa.2011) (declining to strike down laws regulating compensation of voter registration “volunteers”); cf. Preminger v. Peake, 552 F.3d 757, 766 (9th Cir.2008) (holding that Veterans Affairs office’s proffered reason of protecting patient trust as a basis denying partisan voter *901 registration activities in its facilities was a “reasonable rationale”).
As discussed above, Appellees did not expressly explain whether this challenge is facial or “as-applied” in their brief. If facial, as conceded at oral argument, An-drade has made a strong showing that the challenge will fail because these sections can apply constitutionally to proscribe quota or numerically-based compensation situations that all agree are a recipe for fraud. The State has a legitimate interest in preventing fraud. Buckley, 525 U.S. at 204-05, 119 S.Ct. 636. This provision was enacted in part to rectify problems with the previous law that enabled an incentive for fake voter registration applications such as those made through the Project Vote scandal, where employees were paid $1.00 for each voter registration application received. Staff of the House Comm, on Oversight & Gov’t Reform, 111th Cong. (Feb. 18, 2010); see also Comm. Rep. HB 289, 82d Leg. (Tex.2011) (“In many of the scandals, the convicted individuals specifically cited compensation or performance quotas as the incentive to fraudulently complete voter registration forms.”). The district court discounted this rationale because Texas’s provisions are stricter than other states, and found there was no indication that Texas voter registration efforts are more susceptible to fraud. Andrade, — F.Supp.2d at -, -, 2012 WL 3155566, at *6-7, 32. However, Texas has a legitimate interest in protecting against voter fraud.
Even if this challenge were an “as-applied” challenge, Andrade has made a strong showing that it is likely to fail because Appellees have not shown that they actually have been prevented or hindered by this statute from hiring “volunteers” and firing them if they fail to perform properly. Unlike the cases cited by the district court, see, e.g., Citizens for Tax Reform v. Deters, 518 F.3d 375, 377 (6th Cir.2008),[21] the VDR Law does not require third-party organizations to pay only by hourly wage or limit their ability to discharge or reward employees, it merely limits Appellees from using a quota-based metric in isolation to evaluate performance. The hypothetical circumstance where Appellees fire an employee who simply sat at a table and did nothing to engage passers-by or encourage them to vote and then are charged with violating the Compensation Provisions is just that, hypothetical. As such, an “as applied” challenge rests on a faulty premise.[22]
3. Photocopying and Personal Delivery Provisions
Turning to the alleged NVRA violations, we agree with Appellees that federal law preempts state law in this area to the extent of a conflict. We conclude, however, that Andrade has made a strong showing that she is likely to prevail in showing that the Photocopying and Personal Delivery Provisions do not conflict *902 with the NVRA. The NVRA mandates that “[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.” 42 U.S.C. 197Sgg-(6)(i). Texas law as interpreted by the Secretary of State prevents third-party facilitators from photocopying applications before they are processed by the State. Appellees contend that they are copying a “public record” when they photocopy completed voter registration applications in their possession and that, therefore, the Photocopying Provision violates the NVRA. Texas Election Code' § 13.038 states that a VDR “may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person.” Though this provision does not explicitly prohibit photocopying, Andrade interprets this provision to limit VDRs to collecting and properly delivering applications, thereby impliedly precluding photocopying.[23]
While nothing in the Texas Election Code precludes public inspection of properly submitted voter registration applications, including those submitted by VDRs, Texas law, as construed by Andrade, prevents pre-submission photocopying. The NVRA pertains to state-maintained registration records, requiring states to make records available for public inspection and photocopying for two years after submission and processing. The VDR is “deputized” only to receive and transmit completed applications, not to “maintain” them for the state. Tex. Elec.Code § 13.038. The state and federal provisions do not conflict.
Project Vote/Voting for America, Inc. v. Long, 682 F.3d 331 (4th Cir.2012) is not to the contrary. That case specifically addressed records in the government’s possession, rather than in the hands of VDRs. Indeed, the NVRA only applies to records “maintain[ed]” by the State. The district court’s allusion to the State’s constructive possession through VDRs is not based upon any statute, state or federal, and the statute does not permit VDRs to “maintain” the applications.[24] Andrade, — F.Supp.2d at -, 2012 WL 3155566, at *17. The entire purpose of § 1973gg-(6)(i) is to facilitate public inspection of public records, and possession by a county-appointed VDR, perhaps one of hundreds in a given county, does not equate to a public record. Moreover, precluding photocopying until the applications have changed hands is not mere “administrative chicanery,” but protects voter privacy. The Fourth Circuit highlighted that fact, noting that social security numbers may be redacted from applications processed by the State before being “ma[d]e available” to *903 the public. Project Vote, 682 F.3d at 339. This additional privacy protection is unavailable where the State has not yet received the applications. We agree with Andrade that, until these applications are actually received by a government official, they are not “public records maintained” by the State. Accordingly, there is no conflict between the NVRA and the Photocopying Provision.
The NVRA also requires that applicants be able to use the United States mail to forward their registration to the appropriate officials. The Personal Delivery Provision of the Texas statute is not to the contrary, as it does not address whether the prospective voter can mail an application or not, instead limiting a third-party (the VDR) who has agreed to deliver the application for the voter from doing so. Texas law requires an appointed VDR accepting voter registration applications to deliver the forms in person to the county registrar. See Tex. Eleo.Code § 13.042.
Again, the two laws do not conflict.[25] The NVRA simply does not address the use of mails by third-parties to submit applications. Section 1973gg-4 requires states to “accept and use” a federal mail-in voter-registration application. Texas law requires in-person delivery of forms by VDRs to promote accountability and foreclose the excuse of “lost” applications in the mail. Texas is understandably concerned with partisan third-party VDRs potentially motivated to discard applications thought to be adverse to their political leanings.
Importantly, Texas law requires county registrars to accept every voter-registration form that arrives through the mails. See Tex. Eleo.Code §§ 13.071-.072. This includes applications sent through the mails by VDRs in violation of state law. Texas, therefore, “accepts and use[s]” every federal mail application, while penalizing VDRs for using the mail to submit other people’s applications. As a result, individuals in Texas may, in every circumstance, send their applications through the mail. This promotes voter turnout and ease of registration. Texas’s VDR provisions accomplish a similar goal, albeit based in a third-party regime. This law does not conflict with the NVRA’s provision for mail-in applications because individuals may mail their applications in; VDRs may not.
This element of the VDR Law distinguishes it from the law considered by the Eleventh Circuit in Cox, 408 F.3d at 1354-55. The state argued there that the NVRA only requires mailed registration be accepted where the mailing met additional state requirements and that the state may regulate the method of delivery. Id. The court rebutted this assertion, however, stating that the NVRA “simply requires that valid registration forms delivered by mail and postmarked in time be processed.” Id. at 1354. Unlike the law analyzed there, Texas law would have un-disputedly required acceptance of forms sent in contravention of state law. In this way, Texas has established anti-fraud provisions by penalizing nonconforming VDR conduct, yet explicitly set out to comply with the NVRA by accepting applications despite any noncompliance with state law. Again, no conflict.
We thus conclude that Andrade has made a strong showing of likelihood of *904 success on this appeal. Where a lawful statute is enjoined, the state suffers irreparable harm by its injunction and the public interest lies in the enforcement of state laws. See Maryland v. King, — U.S. -, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) (Roberts, as Circuit Justice, in chambers); New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, as Circuit Justice, in chambers); Coalition for Economic Equity v. Wilson, 122 F.3d 718, 719 (9th Cir.1997). While each side can claim harm regardless of how we rule,[26] we conclude that the balance of harms favors Andrade in light of the great likelihood of success on the merits. Accordingly, she is entitled to a stay pending appeal.
Although we have, of necessity, addressed the merits of this appeal in our analysis, we again caution that our ruling does not bind the subsequent merits panel addressing this appeal, and we disclaim any intent to do so. Mattern v. Eastman Kodak Co., 104 F.3d 702, 704 (5th Cir.1997).
Accordingly, as we ruled by order of September 6, 2012, the Emergency Motion for Stay is GRANTED, and the district court’s injunction orders are STAYED until the final disposition of this appeal.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. Although Cheryl Johnson, Galveston County Assessor was also sued in the district court, she did not file a notice of appeal.

. At this point, Andrade has not reasserted the standing issues she raised in the district court. Because standing is a component of federal subject-matter jurisdiction, we must examine it on our own. Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan, 883 F.2d 345, 348 (5th Cir.1989). We conclude that the district court’s analysis of standing is substantially correct, Appellees have standing to bring this case, and Andrade is at least a proper party to respond to it. See Voting for Am., Inc. v. Andrade, No. 3:12-CV-00044, — F.Supp.2d -, --, 2012 WL 3155566, at *9-13 (S.D.Tex. Aug. 2, 2012).

. For purposes of assessing this motion to stay, we examine only the preliminary injunction as modified on August 14, 2012: We note that Appellees challenge additional portions of the VDR Law, but we examine only those as to which enforcement was enjoined by the district court's order and as to which the current stay request pertains.

.Section 13.038 states: "A [VDR] may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person.” Although this provision says nothing about photocopying, Appellees contend, and Andrade does not dispute, that Andrade has taken the position that VDRs are prohibited from photocopying forms they receive and, instead, are limited to transmitting such forms to the appropriate county official.

.Section 13.038, quoted in footnote 4, supra, does not have an express "county-by-county” limitation. Once again, however, the parties seemingly agree that Andrade construes the appointment of a VDR to be limited to the county in which the appointment is made. We note that this interpretation is supported by the language of Section 13.033 which contains the precise wording of the appointment document, including a statement that the county registrar "do[es] hereby appoint_ as a[VDR] for_County,” suggesting that the powers granted by appointment are limited to that county alone. Tex. Elec.Code § 13.033. This section has been the law for over twenty years, yet it has sparked no reported decision.

. The district court’s denial of a stay of judgment pending appeal is generally reviewed for abuse of discretion. See Beverly v. United States, 468 F.2d 732, 741 n. 13 (5th Cir.1972). This is an appellate standard of review, rather than an independent application of the factors relevant to a motion for a stay, as is presented here. Nonetheless, "a district court necessarily abuses its discretion if its conclusion is based on an erroneous determination of the law.” Af-Cap, Inc. v. Republic of Congo, 462 F.3d 417, 425 (5th Cir.2006).

. In granting a temporary injunction, the district court must weigh four factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied *894 outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.” See, e.g., Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir.2011).

. The dissenting opinion takes issue with this statement but, unquestionably, in the ultimate appellate review of the district court's decision, our court will have to examine whether Appellees met their burden to show irreparable harm in order to sustain the preliminary injunction. Whether Andrade is likely to succeed in showing that Appellees did not meet that burden is one question before us in the context of this emergency stay motion.

. At oral argument Appellees conceded that the challenge to the statute was facial, likely because there are insufficient factual allegations in the record to establish the Appellees’ individual harm for an as-applied challenge. The dissenting opinion suggests that it does not matter whether the challenge is facial or "as-applied.” It matters a great deal here because the district court — rather than attempting to construe statutes so as to make them lawful — accepted hypothetical scenarios Appellees posited to enjoin these laws. In an "as-applied” challenge, Appellees could point to some specific situation the district court, and this court in review, could examine. Very little in the way of hard facts — rather than rumor and vague "fears” was actually presented to the district court. Appellees’ concession thus makes sense.

. Appellees’ witness Michael Slater testified that he was not aware of any prosecutions of voter registration drive participants in Texas. Indeed, he testified that his organization conducted a successful large-scale voter registration drive in Harris County, Texas, in 2008 and that the impact of the amendments to the VDR law were “unknown.” Testimony of Appellees' witness Estelle Holmes, a VDR in Galveston County, indicated that she was not aware of any instance where the laws have created concrete problems preventing third-party voter registration.

. We have defined "intermediate scrutiny” in the First Amendment arena as follows: "[W]e ... sustain the provisions [under intermediate scrutiny] if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” Time Warner Cable, Inc. v. Hudson, 667 F.3d 630, 641 (5th Cir.2012) (internal citation and quotation marks omitted).

. Here, that ultimate goal is a laudatory one of having citizens vote. But First Amendment protections exist not just for speech that may be noble but also for speech that is not. The Court's discussion in Meyer, 486 U.S. at 421, 108 S.Ct. 1886, of the rights of parties to “select what they believe to be the most effective means” to advocate a cause cannot be seen as embracing an "anything goes" philosophy for any conduct that may relate in any way to speech or expression. Moreover, the argument that Appellees' expressive activity, here the promotion of voter registration, is contingent on the “success" factor of actually registering voters is a novel interpretation of First Amendment doctrine. While the First Amendment protects the right to have and express political views, nowhere does it protect the right to ensure those views come to fruition. In this context of voter registration, a goal all parties here support, expansive protection would appear harmless. However, applied in other contexts, where the underlying speech is less universally accepted, the effects of such a rule prove otherwise. Imagine for example, the opposite situation, where an organization's goals are to discourage voting and voter registration. Again, the First Amendment protects the expression of such views. But freedom of expression cannot be used to protect that group’s "right” to successfully achieve its expressive goals of preventing others from voting by throwing the registration cards away.
Appellees also rely on Meyer (and the later Supreme Court case of Buckley) to urge that the VDR Law has "the inevitable effect of reducing the total quantum of speech,” limiting "the number of voices who will convey [Plaintiffs’] message and the hours they can speak and, therefore, limit[ing] the size of the audience they can reach.” 486 U.S. at 422, 108 S.Ct. 1886. This argument simply does not apply. No party argues that the law pre *898 vents anyone, regardless of domicile or VDR appointment, from passing out registration forms and encouraging others to vote. The size of the audience remains the same, and the "total quantum of speech” is unaffected. While affirming the striking down of some provisions of Colorado law in Buckley, the Court recognized an "important interest” of the state in protecting the integrity of the ballot initiative process there at issue and in deterring fraud. 525 U.S. at 204-05, 119 S.Ct. 636. Citizens United v. Federal Election Commission, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), discussed by the dissenting opinion here, addressed a ban on political speech based upon the identity of the speaker as a corporation; that issue is not before us.

. At oral argument, Appellees urged the court to draw a close parallel to the Supreme Court’s reasoning in Meyer, 486 U.S. at 422, 108 S.Ct. 1886, finding that the circulation of initiative petitions was a matter involving the core political speech rights of the circulators under the First Amendment. The analogy is improper. The circulation and submission of an initiative petition is closely intertwined with the underlying political ideas put forth by the petition. The petition itself is the protected speech. Moreover, the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign. In the voter registration context, the underlying expressive conduct (encouraging democratic participation and voting) does not implicate a third-party’s right to process the application. Voter registration applications are individual, not associational, and may be successfully submitted without the aid of another. Here, the actual expression is not being limited.

. Appellees do not contend that they should be free to receive a completed application from a prospective voter and throw it in the trash. Implicitly, if not explicitly, they concede the importance of making sure this process is handled carefully and without fraud or malfeasance.

. The Eleventh Circuit affirmed a district court’s preliminary injunction enjoining a Georgia voter registration statute, which rejected voter registration forms submitted to the state in a single mailed package. Charles H. Wesley Educ. Foundation, Inc. v. Cox, 408 F.3d 1349 (11th Cir.2005) (finding the "associational and franchise-related rights asserted ... were threatened with significant, irreparable harm ... without question in the public interest.”) However, this case is easily distinguishable because in applying its "anti-bundling” provision, Georgia refused to accept the wrongfully submitted applications, thus impermissibly depriving the applying voters of franchise. The Texas code only operates to penalize VDRs who do not submit applications according to statute, while still accepting a voter’s timely application in compliance *899 with the NVRA. Moreover, although the petitioners in Cox alleged First Amendment violations, neither the district court nor the 11th Circuit addressed any constitutional rights concerning the receipt and submission of voter registration applications.

. One key difference between the Florida statute at issue in Cobh and the Texas VDR Law is that the Florida statute discriminated against non-political party organizations. Cobb, 447 F.Supp.2d at 1335. An appeal of the district court’s decision was dismissed as moot after Florida substantially amended its statute. League of Women Voters of Fla. v. Browning, 575 F.Supp.2d 1298, 1300-1301 n. 3 (S.D.Fla.2008). Thereafter, that district court declined to enjoin enforcement of the amended law. League of Women Voters of Fla. v. Browning, 575 F.Supp.2d 1298, 1325 (S.D.Fla.2008). Several years later, a different district court in Florida preliminarily enjoined enforcement of a still further amended statute that contained a "48-hour” requirement for turning in applications and which the court construed as a prohibition of use of the mails. League of Women Voters of Fla. v. Browning, 863 F.Supp.2d 1155 (N.D.Fla.2012). Importantly, there, the state claimed no interest in prohibiting third-party registrants from using the mails. Id. at 1162-63. Thus, the arguments presented here were not addressed.

. Mr. Slater was asked, "What is your opinion about parachuting in, is that an effective way to do things?” He answered: "No, it’s not an effective way to do that.”

. When given the chance to actually submit facts to support his concerns about Texas, Slater had little to offer beyond the bare conclusion that it is "too difficult” to conduct voter registration drives in Texas.

. Slater admitted that paying "volunteers” for each registration encourages fraud.

.Appellees presented expert testimony to the effect that low paid "unskilled workers," such as those they would hire to engage in voter registration outreach, need goals in order to be motivated to work. The expert witness admitted having no actual knowledge of voter registration work or employees who work in that field.

. The Ohio code at issue in Citizens for Tax Reform stated "No person shall pay any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked.” 518 F.3d at 377.

. The district court made no specific findings of fact with respect to particular harm to Appellees, stating only: "Plaintiffs presented a significant amount of testimonial and documentary evidence detailing how the challenged provisions of the Election Code prevent them from conducting effective voter registration activities in Texas.” Andrade, - F.Supp.2d at -, 2012 WL 3155566, at *33. We cannot give deference to such conclusory findings of fact, particularly in light of the actual evidence presented to the trial court which provided little in the way of detail or facts underlying the broad conclusions reached.

. Whatever the salutary purpose of the photocopying (as discussed in the dissenting opinion), the question is whether the Photocopying Provision conflicts with the NVRA, not whether it is a good idea. We note, however, that Slater testified that the photocopies are kept "forever” on a datábase, and he does not know how secure the database is. Appellees state that they redact sensitive information such as drivers’ license or social security numbers if required to do so by state law before copying. While we do not question their sincerity, we note that it is not unreasonable for the State to require parties to obtain public government records from the government, which can then make sure that appropriate redactions occur before the records are released.

. To the contrary, they must deliver them to the county registrar within five days. Tex. Elec.Code 13.042(b).

. Rather than trying to construe the state and federal laws in harmony, the dissenting opinion finds a conflict in that VDRs cannot use the mails. However, the NVRA does not address whether third-parties to the registration process must be permitted to use the mails. Thus, there is no actual conflict.

. The dissenting opinion focuses on harm to Appellees' "business model” from the Texas restriction. For example, Appellees want to copy applications so they can "follow up” with potential voters. However, they put on no evidence in the district court that they are prevented from obtaining information from potential voters by simply asking them for follow-up contact information such that they can contact the potential voter by the means most efficacious for that voter (mail, e-mail, telephone, or some other means). The dissenting opinion also catalogs perceived harms caused by various provisions of the law not at issue here. For example, the dissenting opinion describes the five-day delivery period requirement of § 13.042(b) as burdensome, although this provision was not enjoined beyond the “personal delivery” portion. Additionally, this provision has been in place for over twenty years, yet Slater admitted that his organization conducted a "successful” voter registration drive in Harris County, Texas in 2008, registering 23,000 voters, apparently finding it possible to comply with this law.